DONALD VANDENBERG, ADMINISTRATOR OF THE ESTATE OF THOMAS VANDENBERG, DECEASED, APPELLEE, v. IRVIN LANGAN ET AL., APPELLANTS.

224 N. W. 2d 366

Filed December 26, 1974. No. 39481.

Jewell, Otte, Gatz & Collins and Baker, Tessendorf & Milbourn, for appellants.

John P. Miller of Miller & Rowen and M. J. Bruckner of Marti, Dalton, Bruckner, O'Gara & Keating, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

BRODKEY, J.

This appeal involves an action brought by Donald

Vandenberg, father, and administrator of the estate of Thomas Vandenberg, deceased, against the defendants, Irvin Langan, and his employee, Steve Greisen, for the wrongful death of Thomas Vandenberg when he fell or was thrown from a flatbed hayrack being pulled by a tractor owned by the defendant Langan and operated by the defendant Greisen. The court decided, as a matter of law, that the defendants were negligent, holding the decedent to be other than a guest at the time of the accident, and directed liability against them. The court submitted only the question of the amount of the damages to the jury, which returned a verdict in the amount of $36,797.80. Judgment was entered upon the verdict. Defendants filed motions for a judgment notwithstanding the verdict and also for a new trial, both of which motions were overruled and defendants thereafter appealed to this court. We affirm.

The facts of this case are that at the time of the accident, and for many years prior thereto, the defendant Langan was engaged in the business of custom baling for farmers in the Platte Center, Nebraska, area. In connection with that business he owned certain equipment, including tractors, trailers, balers, and several flatbeds and hayracks. On the day of the accident, the defendant Greisen, a 16-year-old youth, was employed by Langan to operate the tractor pulling the baler and wagons, and at the time of the accident was, as directed by Langan, transporting the tractor, baler, two wagons, the decedent, and two other boys to a job site, which was a field of hay owned by a farmer named Gerald Krings. Langan had done custom baling for Krings for a number of years prior thereto, specifically during the years 1968, 1969, and 1970. About 2 days prior to the accident in question, which occurred on July 28, 1971, Krings contacted Langan and again hired him to do custom baling for him. At the same time he requested Langan to obtain additional help for him to assist in

loading the bales of hay on the hayracks, as he had done in some, but not all, of the previous years.

Krings testified that it was Langan's usual custom and practice in previous years to arrange for and bring the help when requested, but he did not know who the helpers would be on this occasion or who was going to bring them out to his farm on the day in question. Krings paid Langan by the bale and paid the boys separately for their labor at the rate of about $2 per hour. On the day of the baling Krings talked to Mrs. Langan and asked her to get the extra help but stated if they couldn't get the help they should just drop the bales on the ground. Langan ordinarily took the boys out to the job site on either the wagons or a truck but he testified there was no set way for the boys to get out to the field and they could furnish their own transportation if they so desired. Langan had a certain crew of boys which worked for the farmers generally, and who worked for Langan in the same manner the year before and during the year in question. This crew included the decedent. It was Langan's custom that he would always notify the boys if they were going out to work and on the day in question he did notify Rick Cook, Dick Jasper, and the decedent, according to his usual custom in that regard.

At Langan's direction, the three boys and Greisen, met at the Langan place at the designated time and helped hook up the equipment in a tandem fashion. When they left the Langan place, the three boys were riding on the front of the first flatbed trailer with decedent on the right, Rick Cook in the middle, and Dick Jasper on the left. Greisen was driving the tractor. According to the evidence there were two possible routes to reach their destination; one was to stay on a county road all the way which would necessitate driving down a long hill, and the other route necessitated driving three-quarters of a mile on U. S. Highway No. 81. Greisen chose to take the county road as Langan had

told him to stay off the highway as much as possible. The county road chosen by Greisen went straight east up a very high hill which road eventually turned south down to the level road. At the crest of the hill, Greisen shifted the tractor into road gear, the fastest gear, until he came into a curve in the road to the south. The curve was banked and tilted toward the west at the point where the road proceeded down hill to the south. He continued in the fastest gear.

After starting down hill in road gear he opened the tractor up so that it was going as fast as it could go down hill, and then took the tractor out of gear. He testified that he took the tractor out of gear so that it would go faster down hill. He also stated that he knew when he took the tractor out of gear there was no way he could get the tractor back in gear until he came to the bottom of the hill and that he would not be able to apply the brakes hard enough to stop. As he came down the hill he could feel vibration coming from the tractor, baler, and racks. The racks were whiplashing from side to side taking up most of the road. He started applying the brakes, and heard someone yell. When he looked around he saw the decedent lying on the ground in about the middle of the road. He also testified that after he took the tractor out of gear coming down the hill, he never looked back to check to see how the boys on the wagon were doing, but stated that he had no concern about his speed or the safety of his passengers prior to the time someone had yelled at him and that he had no trouble getting the tractor stopped.

As a result of the accident Thomas Vandenberg sustained head injuries from which he ultimately died, without ever regaining consciousness. He was 16 years of age at the time of the accident.

We first address ourselves to the question of the propriety of the trial court directing liability under the facts of this case, rather than submitting that issue to the jury. It appears that the principal issue in this case

involves the applicability of the Nebraska guest statute and requires a determination of whether the decedent in riding on the hayrack at the time in question occupied the status of a "guest" under that statute, as claimed by defendants, or was other than a "guest," which is the contention of the plaintiff.

Section 39-6,191, R. R. S. 1943, formerly section 39-740, R. R. S. 1943, is the Nebraska guest statute referred to, and provides as follows: "The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in such motor vehicle as a guest or by invitation and not for hire, unless such damage is caused by the driver of such motor vehicle being under the influence of intoxicating liquor or because of the gross negligence of the owner or operator in the operation of such motor vehicle. For the purpose of this section, the term guest is hereby defined as being a person who accepts a ride in any motor vehicle without giving compensation therefor, but shall not be construed to apply to or include any such passenger in a motor vehicle being demonstrated to such passenger as a prospective purchaser." Under the above statute, if the decedent occupied the status of a "guest" as defined therein, the defendants would not be liable to the plaintiff for their ordinary negligence, if any, but would be liable only for "gross negligence" on their part or for operating a motor vehicle under the influence of intoxicating liquor, which is not an issue in this case.

We have held that the term "compensation," as used in the foregoing statute, is not limited to payment for transportation in cash or its equivalent. Van Auker v. Steckley's Hybrid Seed Corn Co., 143 Neb. 24, 8 N. W. 2d 451 (1943). In the foregoing case this court also laid down the rule to be applied in determining whether a passenger in an automobile is or is not a "guest" under our statute and stated: "* * * if his carriage contributes such tangible and substantial benefits as to promote the mutual interests of both the passenger and the own-

er or operator, or is primarily for the attainment of some tangible and substantial objective or business purpose of the owner or operator, he is not a guest."

Subsequently, in the case of Bailey v. Pennington, 274 F. 2d 328 (1960), the Eighth Circuit Court of Appeals, in interpreting the Nebraska guest statute, stated: " 'Where the trip is primarily for a business purpose rather than a social purpose, it is sufficient to show that the driver was to derive a substantial benefit from the transportation, and such substantial benefit may be found if the transportation was for the mutual economic benefit of all concerned. (Citations omitted.)' " See, also, Carman v. Harrison, 362 F. 2d 694 (8th Cir., 1966).

Defendants contend that there was no benefit to them for providing the work crew and hayracks, and in transporting the work crew to the scene of their labors; and contend that this was done merely as an accomodation to the farmers. They also argue that the presence of the boys to stack the bales was not, in any way, beneficial to them, as their presence made the work go slower. Langan also testified that in the past he had done baling for his customer Krings, and had occasionally put bales on the ground, and that Krings always came again to seek his help, inferring thereby that there was no benefit to him in providing such accommodations for this customer. There is no evidence as to what his practice had been with respect to his other customers for whom he did custom baling.

Notwithstanding the claims of the defendants, as above set out, we believe the record in this case clearly shows a joint business purpose and a joint economic benefit to all concerned, and that they received *tangible and substantial* benefits therefrom. An interesting case in this regard is the case of Sproule v. Nelson, 81 So. 2d 478, 76 A. L. R. 2d 1066 (Fla., 1955). In that case Sproule was an employee of Standard Oil Company, and Nelson was a mechanic in the employ of National Air Lines. In December of 1952 while engaged in filling

the tanks of an airplane, Sproule being the driver of a Standard Oil Company gasoline truck, and Nelson directing the operation, the truck was backed up too far and caught Nelson between the wing of the airplane and the gasoline truck, from which he suffered severe injuries. He brought action against Sproule and his employer Standard Oil Company and recovered a judgment against them, from which an appeal was prosecuted to the Supreme Court. One of the grounds assigned for reversal was that Nelson was a guest passenger on the truck and was barred from recovery under the Florida guest statute which required the proof of gross negligence. The court held that the guest statute did not apply stating: "The evidence shows that the transportation in question was for the mutual advantage of the plaintiff and appellant and that riding the truck was customary practice when fueling the wings of an airplane."

We also feel that the trip in this case was primarily for a business purpose and not for social reasons. In this case we must consider the total relationship of the parties and the total method of dealing between them. The evidence is undisputed that Langan was a custom baler, and had been for years, selling his services not only to Krings, but to many farmers in the Platte Center area. That being so, he was clearly dependent upon the goodwill and satisfaction of his farm customers generally, not only Krings. The fact that he had, as part of his business equipment, a number of hayracks, generally available to all his customers, and also, on request of such customers, had provided boys to work in the fields and assist in the haying operations, and, according to the testimony, generally called the same crew, clearly indicates that he considered such business practices desirable and valuable to him in his business for the purpose of satisfying the retaining customers generally and promoting "goodwill" for his business. Goodwill may have a real and substantial value in the sale

of a going business, to which most accountants and businessmen will readily testify. All the arrangements on the day in question were made by Langan and were directly connected with the operation of his custom baling business, and he carried out and continued a practice he himself had instituted over the years in the operation of his business. Also, as pointed out by plaintiff in his brief, the hooking up of the tractor and baler and hayracks by the boys, as well as the traveling to the field, were all for the attainment of a business purpose with benefits going to Langan and to the boys in the sense that each was to make money out of the transaction. We conclude, therefore, that under the facts of this case there was sufficient consideration flowing to the defendants to take this case out of the guest statute, and to make the defendants herein liable to the plaintiff for the results of ordinary negligence on their part. The defendants received tangible and substantial benefits from the arrangement.

Reasonable minds could reach only one conclusion from the evidence in this case as to the negligence of the defendants herein, and the trial court was eminently correct in directing on the issue of their liability, rather than submitting such issue to the jury. In fact, it might well be argued, as plaintiff does, that even if the standard of "gross negligence" were applied under the guest statute, the evidence would be sufficient to have directed on that issue also. In view of what we have stated above, however, there is no necessity for our deciding that point at this time, and we do not do so.

In connection with the claim of the defendants that the issue of contributory negligence on the part of the decedent should have been submitted to the jury, we have read the entire record in this case and find no evidence whatsoever of anything even approximating contributory negligence on the part of decedent. In the absence of such evidence, it would have been highly improper for the trial court to have submitted that issue.

It is also the contention of the defendants that the amount of the verdict, $36,797.80, is excessive in this action for damages involving the death of a 16-year-old boy. They point out that the specials involved herein were in the amount of $4,147.80 and that the balance of the damages in the amount of $32,650 must necessarily come under the heading of and flow from "loss of society, comfort, and companionship," as set out in Selders v. Armentrout, 190 Neb. 275, 207 N. W. 2d 686 (1973). We do not agree. The record in this case reveals that the decedent was a very unusual youth, with great potential for a bright and promising future, both athletically and scholastically. The evidence established that he would, indeed, have been a source of great comfort and companionship to his parents, and that the loss of his society was very real. That matter was submitted to the jury under proper instructions and we are not inclined to disturb its verdict.

There are, however, two other matters on which we should comment. During the trial of this case Mr. John Miller, one of counsel for plaintiff herein, suddenly became ill, and it was necessary to call an ambulance and take him from the courthouse by stretcher to the hospital. The jury was excused for a period of 3½ hours and on his return a motion for mistrial was made by counsel for the defendants on the basis that the incident could only have prejudicial effect on the jury so far as the defendants were concerned, in that it would aggravate the sympathy, passion, and prejudice of the jury. Defendants' counsel make it clear in their brief that they have no intention to indicate or infer that Mr. Miller was guilty of any chicanery or misconduct. We agree and point out that on numerous occasions both before and during the trial, and after the incident in question, the jury was repeatedly cautioned not to let sympathy influence its verdict. Mr. Miller, himself, during final argument, urged the jury not to do so and to

ignore the incident. We find no validity in this contention on the part of the defendants.

Defendants also complain of the conduct of M. J. Bruckner, also counsel for the plaintiff, and the uncle of the deceased, with respect to his argument to the jury in summation as follows: "I selected John Miller out of a group of a number of excellent trial lawyers because I knew him well, I have known him since law school, and he is a sensitive feeling individual, and unfortunately I cannot say that about all trial lawyers that I know. He has probably as much appreciation for life as any lawyer I know, I have known him that long. And I know, and I knew then, when I recommended him to my sister and to my brother-in-law, that he would really put himself into this, and he has; and in my opinion has done a masterful job of bringing the evidence before you in this case, which is our primary responsibility." And later in the same argument: "And I marvel again. John Miller, as I indicated to you, is a sensitive fellow and he is a good lawyer, and I think you noticed that. But he is a reasonable guy, and that's the other reason that I had him here. And I asked John, I said, 'John, you evaluate this case because I knew Tommy too well.' " Defendants argue that by virtue of the above remarks, Mr. Bruckner requested the jury to take Mr. Miller's statement of the value of the case, as if Mr. Miller's suggestion were the evidence of an expert. While we do not approve of the argument above recited, we believe that in this case it was without prejudice, particularly in view of the cautionary remarks given by both the attorneys and the court to the jury to eliminate passion and prejudice from its decision, and also in view of the fact that the actual verdict of the jury was substantially less than the amount of $50,000 suggested by Mr. Miller in his argument to the jury.

We have examined the other errors assigned by counsel and find them to be without merit. We conclude

therefore that the judgment in this case should be, and hereby is, affirmed.

AFFIRMED.